**UNITED STATES of America**

v.

**Louis AGNES.**

**Crim. A. No. 82–320.**

United States District Court,
E.D. Pennsylvania.

Feb. 27, 1984.

Joseph D. Mancano, Asst. U.S. Atty., U.S. Dept. of Justice, Phila. Strike Force, Philadelphia, Pa., for plaintiff.

Thomas Colas Carroll, Philadelphia, Pa., for defendant.

### MEMORANDUM

HUYETT, District Judge.

On October 18, 1982, Louis Martin Agnes, Mitchell Inselberg, Michael Morrone and Jennifer Santilli were charged in a two count indictment with obstruction of interstate commerce in violation of the Hobbs Act, and conspiracy to violate the Hobbs Act. Agnes was convicted on March 14, 1983, after a four-week trial, of interfering with interstate commerce by means of extortion. He was acquitted of the conspiracy charged in Count II. The three co-defendants were acquitted on both counts.

Agnes filed post-trial motions seeking judgment of acquittal or, in the alternative, a new trial, on April 4, 1983 pursuant to an

extension of time I granted him because of a change in his counsel.[1] On April 2, 1983 I issued an order permitting defendant to file a memorandum of law in support of his motions within fourteen days following the filing of the trial transcript because defense counsel stated that he could not adequately brief the motions without reference to the trial transcript of the proceedings. On August 15, 1983 the transcript was filed. Thereafter defendant filed his memorandum of law and the government responded. On November 30, 1983 I issued an order denying Agnes' motions and scheduled sentencing. This memorandum contains a statement of my reasons.

The evidence at trial showed as follows: In the fall of 1980 Agnes met and became friendly with Joseph Lam and Sheryl Hahn, who were both stained glass artisans working at the Glass Workbench, a stained glass workshop and gallery in New Hope, Pennsylvania. Agnes was interested in their work and visited them at the Glass Workbench on occasion to make purchases of stained glass objects made by them. Agnes told Lam and Hahn he believed that their craftsmanship was superior to that of other stained glass artisans in the area and stated that if they ever decided to open a shop at their own, he would be interested in providing them with financial backing.

In April, 1981, Hahn and Lam learned that the lease on the building in which the Glass Workbench was located would soon become available and they decided to take Agnes up on his offer and open their own business. After some discussion, Agnes loaned Hahn and Lam $5,000 in cash, at no interest. Agnes asked Lam to sign an I.O.U. for the money and stated that he would have a friend of his, Edward Tierno, draft more formal loan documents for their signatures.

Lam and Hahn opened their new business, Crescent Stained Glass Company, in mid-April, 1981. It was not until one month later that Agnes and Tierno met with Lam and Hahn with the formal documents prepared by Tierno. However, instead of the loan agreement that they believed Tierno would prepare, the documents were in the form of two limited partnership agreements which formed two interlocking partnerships, Crescent Stained Glass, which manufactured stained glass, and Glass Works, which sold stained glass objects. Hahn and Lam were upset and confused. Not only was the form of the documents unexpected, but Agnes' name did not appear on them. Instead, the documents contained the names Michael Morrone and Jennifer Santilli along with Lam's and Hahn's names. Agnes told them that these names were used as "straw parties" to represent his interest because he was going through divorce proceedings and did not want his wife to learn of his assets. Because of these circumstances Lam and Hahn did not want to sign the agreements. They eventually did sign them that evening, however, because Agnes became angry and began threatening them. The agreements described the $5,000 loan as a capital investment by Marrone and Santilli. The agreements provided that beginning in July, 1981, the $5,000 would be repaid over a period of twenty-one months, at a rate of $238.10 per month. The total amount repaid would be $5,000.10.

Although the loan payments were not to begin for three months, Agnes began asking Lam for money from the business almost immediately. In May, 1981, at Agnes' insistence, Lam leased a Mercedes Benz automobile for Agnes. In June and July, 1981, Lam gave Agnes two cash payments of $1,000 each in response to his constant demands for more money.

---

**1.** Following his conviction, defendant moved for leave to substitute Thomas Colas Carroll, Esquire, for Gilbert Scutti, Esquire, defendant's trial counsel, for purposes of post trial motions and sentencing. Defendant stated that irreconcilable differences had arisen between Mr. Scutti and him. Because of Mr. Scutti's extremely competent handling of the case both before and during the trial, I was reluctant to grant this motion. On April 4, 1984, however, conscious of the importance of a criminal defendant's choice of counsel, I issued an order granting defendant's request.

Business at Crescent did well for several months. In mid-July, however, business slowed considerably. At this time Agnes began to accuse Lam of stealing money from the business. Agnes refused to believe that business was bad and continued to accuse Lam of embezzling from the business and converting partnership property. Lam categorically denied this, but Agnes continued to demand money payments from him. When Lam stated that he had no more money to pay Agnes, Agnes began to threaten Lam. On more than one occasion Agnes told Lam that he had "buried people" for less than what Lam was doing. He also threatened to break Lam's arms and legs on several occasions during his demands for more money.

On September 13, 1981 at 8:30 p.m. Agnes arrived at the shop, entering through the back door with Inselberg, Santilli, Morrone, and three men. The shop had closed earlier in the evening but Hahn and Lam were present, along with Thomas Bryant, Leigh DiMezza, and Michael Rogers, who were employees. Agnes announced to those present that "the business is closed," and that he was "pulling the plug." Agnes then threatened Lam, stating "don't get in my way or I'll break every bone in your body starting with your face." Agnes then hit Lam in the face. Agnes stated that because Lam ripped him off, he was taking everything in the shop. Agnes told Lam that if Lam knew what was good for him, he would make sure that no one interfered with Agnes and those accompanying him. All present were put in fear by defendant's actions and threats.

Agnes then supervised the removal of all the items from the shop. He told Lam that if he did not want all the stained glass items to be broken in the loading process, he had better help pack. During this time, Agnes directed those who had accompanied him, coordinating their efforts. He decided which items that they would take and which would be left behind. Agnes also told Morrone to guard Lam so that he did not leave the store or prevent them from removing items from the store.

Agnes continued to threaten Lam throughout the evening. He repeatedly told Lam, among other things, that he was going to break Lam's legs, that he would break Lam's hand so that he could never make stained glass again, that he should put a bullet through Lam's head, and that Lam didn't deserve to see his next birthday. Lam, as well as Hahn, and the other store employees who witnessed these events were all severely frightened and intimidated by Agnes and his threats and threatening behavior. When one employee, Thomas Bryant, attempted to hide certain consigned items from Agnes so that they would not be taken, Agnes confronted him, threatened him, and then hit him in the jaw causing Bryant to fall and injure his head. Bryant had to receive medical treatment for these injuries, which were diagnosed as a concussion. None of the others tried to prevent Agnes and the others from emptying the store, even though they knew a number of the items were consigned and did not belong to Crescent. Morrone continued to guard Lam and Agnes continued to behave in a threatening manner. The New Hope police, alerted to some unusual events occurring at the store, came to the shop twice. Each time Lam told them that everything was alright, after being threatened by Agnes.

Almost everything in the shop was taken including business records, stained glass items, personal and consignment goods. Before he left, Agnes forced Lam to sign a receipt which stated that Lam sold the contents of the shop to Agnes for $1. Lam signed the receipt after Agnes told him that he would never cut glass again if he refused to sign and Morrone told him to do what Agnes wanted and he wouldn't be hurt. As he left, Agnes told Lam he would break Lam's legs if Lam touched the business checkbook and that he would return the next day to put a bullet through the shop's inventory of raw glass, which did not fit in the Mercedes Benz and the pickup truck in which the group arrived.

When Lam subsequently tried to get some of the items back from Agnes, Agnes

discouraged Lam from such recovery efforts stating that he should have put a bullet in Lam's head when he had the chance.

In March, 1982, during searches made pursuant to separate warrants, the Philadelphia Police Department and the FBI removed business records for the business and some of the stained glass items from Agnes' apartment.

Agnes has moved for a judgment of acquittal, arrest of judgment, or, in the alternative, for a new trial.[2] I shall address the grounds he raises *seriatim.*

### 1. *Jury instructions regarding intent*

Defendant argues that a new trial is warranted due to "fundamentally deficient jury instructions on a key issue in this case *i.e.,* the defendant's criminal intent." Defendant contends that my instructions failed to adequately discuss the intent one must possess in order to be found guilty of extortion under the Hobbs Act. In support of his allegations, defendant quotes an isolated portion of my charge, which he contends is inadequate to inform the jury of the intent necessary to find him guilty of Hobbs Act extortion. When read as a whole, I believe that my instructions to the jury adequately address the issue of intent.

The adequacy of jury instructions is to be determined by an examination of the charge as a whole. *United States v. Palmeri,* 630 F.2d 192, 201 (3d Cir.1980), *cert. denied,* 450 U.S. 967, 101 S.Ct. 1484,

67 L.Ed.2d 616 (1981). Accordingly, small portions of a charge are not to be judged in artificial isolation. *Id.* The portions of the charge challenged by the defendant must therefore be read in the full context of my instructions.

When I began my charge to the jury, I instructed them that they should consider my charge as a whole, and should not emphasize one instruction to the exclusion of another. Tr. 17–16. I described to the jury the charges contained in Count I of the indictment, telling them that defendant was charged with obstructing interstate commerce and attempting to do so by extortion in violation of the Hobbs Act. Tr. 17–27. I read the relevant portions of the statute. Tr. 17–28. I then outlined the elements of the offense, stating that the Government was required to prove each element beyond a reasonable doubt: (1) that the defendant induced his victim to part with property; and (2) that the defendant did so by extortion as defined in my instructions; and (3) that in doing so, interstate commerce was interrupted or adversely affected. Tr. 17–28. I told the jury that extortion is "the obtaining of property from another with his consent, when the consent is induced by the wrongful use of actual or threatened force, violence or fear." Tr. 17–29/30. By way of further explanation, I stated that the mere voluntary payment of money or delivery of property not induced by the wrongful use of actual or threatened force, violence or fear would not constitute extortion. Tr.

**2.** Defendant asserted twenty grounds in support of his motion for a new trial in his April 28, 1983 supplemental statement of grounds for post-trial relief. In the memorandum of law he filed subsequently, however, defendant discusses only seven grounds which he argues entitle him to a new trial, and he has not pursued his motions for arrest of judgment and judgment of acquittal. I assume that defendant has abandoned the remaining grounds for post-trial relief, but I have considered them and find them to be without merit. I feel compelled, however, to comment on defendant's motion for judgment of acquittal based on insufficiency of the evidence. A jury's verdict must be sustained if, when viewed in the light most favorable to the government, there is "substantial evidence" to

support the jury's decision. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). When viewed in the light most favorable to the government, the evidence against Agnes is overwhelming. The testimony at trial is replete with references to the threats made by Agnes. Lam and Hahn would not have signed the partnership agreements except for threatening behavior of Agnes. As set out more fully above, Agnes threatened Joseph Lam with physical injuries constantly during the summer of 1981. All present during the evening of September 13, 1981 testified to the atmosphere of fear created by Agnes' threats and threatening behavior, which caused them not to interfere with those emptying the shop.

17–31. I then gave the instruction challenged by the defendant:

It is not necessary for the Government to show that a defendant intended to specifically obstruct, delay or affect interstate commerce. It is necessary that the Government's evidence prove that the defendant intended to commit an act prohibited by the statute, the natural consequences of which would be to obstruct, delay or affect commerce.

Intent and motive should never be confused. Motive is what prompts a person to act, while intent refers only to the state of mind with which the act is done.

Tr. 17–33/34.

Defendant objects to that portion of my charge in which I stated that the government must prove "that the defendant intended to commit an act prohibited by the statute." This instruction, when examined in light of my prior statement that the defendants were charged with violating the Hobbs Act by extortion and my definition of that term, clearly states that the government must prove that the defendants intended to commit extortion as I defined that term. Thus, when read as a whole, my instructions stated that the government was required to prove beyond a reasonable doubt that the defendants intended to obtain property from the victim by inducting that person's consent through the wrongful use of actual or threatened force, violence or fear. This clearly goes beyond that which is required under the Hobbs Act. *See United States v. Mitchell*, 463 F.2d 187, 192 (8th Cir.1972), *cert. denied*, 410 U.S. 969, 93 S.Ct. 1449, 35 L.Ed.2d 705 (1973); *United States v. Furey*, 491 F.Supp. 1048, 1061 (E.D.Pa.), *aff'd*, 636 F.2d 1211 (3d Cir.1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 304 (1981).

Defendant contends that my instructions to the jury were deficient because I did not tell the jury that they must find that the defendant intended to instill fear into the victim.

My instructions to the jury were taken almost verbatim from those contained in Devitt & Blackmar. No one submitted to me a point for charge on the issue defendant now raises. Defendant's attorney submitted no proposed points for charge, but joined in those filed by other defense counsel. Neither counsel for the other defendants nor the government submitted such a proposed instruction.[3] Likewise, no one raised any objection to my charge for the reason defendant now raises. Thus, I had no opportunity at trial to evaluate the point defendant now raises.

In *United States v. Furey, supra,* the defendant was charged with attempted extortion and conspiracy to extort in violation of the Hobbs Act. *Id.* at 1052–53. Like the defendant here, he asserted as error the court's failure to charge the jury that they must find that the defendant intended to instill fear in the mind of his victim. *Id.* at 1062. After reviewing the legislative history of the Hobbs Act and New York state decisional law defining extortion, Judge Bechtle rejected this contention. *Id.* at 1061–63. He stated that the Hobbs Act is a general intent statute and not a specific intent type of statute, and that Congress intended that it not be necessary that the defendant intend to instill fear in the victim, but only that the natural and necessary effect of the defendant's actions be to instill fear in his victim. *Id.* at 1063. Judge Bechtle saw the critical inquiry as the effect of the defendant's actions on the victim. *Id.* In my charge I instructed the jury that the victim's consent must be induced by threats or actual violence, force or fear, and that the voluntary delivery of property not induced by threats or fear would not constitute extortion. I thus adequately described the requisite effect of the defendant's actions on the victim.

In *Furey*, Judge Bechtle relied on the decision in *United States v. Green*, 246

---

**3.** The only instruction submitted to me by any defendant on the issue of intent was that submitted by defendant Mitchell Inselberg requesting that I tell the jury that they must find that the defendants "intended to commit extortion."

F.2d 155 (7th Cir.1957), in which the defendant moved for judgment of acquittal, arguing that the government had failed to prove an intent to extort. *Id.* at 159. The court rejected this argument stating: "Clearly the proof of a general intent to commit the crime charged is a necessary element.... However, it is axiomatic that a person is held to intend the natural consequences of his acts." *Id.* at 159–60 (citations omitted).

Defendant argues that the rule set down in the above cases does not survive the Supreme Court's decision in *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Defendant's argument is without merit.

In *Sandstrom* the defendant was convicted of deliberate homicide. Over objections of the defendant, the jury was charged that "the law presumes that a person intends the ordinary consequences of his voluntary acts." *Id.* at 513, 99 S.Ct. at 2454. The Court held that such language created an impermissible presumption by shifting the burden of proof regarding the element of intent to the defendant and that the charge thus violated the fourteenth amendment. *Id.* at 521–24, 99 S.Ct. at 2457–59.

The *Sandstrom* case is different from our case and the cases in *Green* and *Furey. Sandstrom* involved a specific intent crime, deliberate homicide, which required proof that a defendant purposely and knowingly caused the death of another. There is no such specific intent requirement under the Hobbs Act. *Furey, supra,* at 1059. Additionally, *Sandstrom* involved an instruction which created a conclusive presumption regarding the element of intent. Such an instruction was not given here, nor in *Green* or *Furey.*

For all of the reasons above, I believe that my charge, when examined as a whole, properly instructed the jury on the requirements of intent under the Hobbs Act.

### 2. *Claim of right defense*

Defendant contends that I erred in ruling that a claim of right to property taken by means of extortion is no defense to the charge in this case. Defendant argues that I also erred in my evidentiary rulings and in my charge to the jury in this regard. Accordingly, defendant argues that he is entitled to a new trial.

■ Defendant asserts here essentially the same arguments that he raised at trial. Defendant contends that Joseph Lam and Sheryl Hahn entered into a contractual relationship with Jennifer Santilli and Michael Morrone, who were acting as "straw men" for him. According to defendant, these contracts created "interlocking partnerships, Crescent Stained Glass and the Glass Works, with rights and liabilities *inter sese.*" Through these contracts, defendant states, he became entitled to certain property which ultimately became the subject of these proceedings. Defendant argues that the jury could have inferred that Joseph Lam committed certain unprivileged acts regarding the partnerships' business and that Agnes believed that his action on September 13, 1981 in removing the property from Crescent Stained Glass was "not only legally permissible but a socially desirable method of dissolving the partnership." Defendant contends that his lawful right or belief in a right to the property involved is an affirmative defense to the crime of Hobbs Act extortion. Defendant argues that this claim of right is also relevant to the intent requirements under the Hobbs Act.

In support of this position, in his post-trial motion defendant relies heavily on the Model Penal Code. The Model Penal Code contains a little-adopted provision that an honest belief by a defendant that he has a right to the property involved and to acquire the property by the method employed will provide an affirmative defense to prosecution for theft. *Model Penal Code* § 223.1(3). Such a belief would not, however, provide a defense to offenses such as assault, reckless endangerment, or criminal coercion.

Defendant's reliance on the *Model Penal Code* is misplaced. The *Model Penal Code*

is not the law in this jurisdiction, nor has the section above been accepted in a majority of states which have adopted the *Model Penal Code*. More importantly, however, and as defendant admits, this section of the *Model Penal Code*, directly contravenes the decisional law in this circuit and others regarding Hobbs Act extortion. Thus, defendant asks me to ignore all contrary decisions and adopt as a correct interpretation of the Hobbs Act the *Model Penal Code* view regarding the claim of right defense.

In addition to the *Model Penal Code*, defendant relies primarily on the Supreme Court's decision in *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). The defendants in *Enmons* were members and officials of labor unions representing striking Gulf States Utilities Company employees. The indictment charged that the defendants and others conspired to use and did in fact use violence to obtain for the striking employees higher wages and other employment benefits from the company, in violation of the Hobbs Act. *Id.* at 398, 93 S.Ct. at 1008. The defendants' motion to dismiss the indictment was granted by the trial court. *Id.* After an extensive review of the Act's legislative history, the Supreme Court held that the Hobbs Act does not proscribe violence committed during a lawful strike for the purpose of inducing an employer's agreement to legitimate collective bargaining demands. *Id.* at 411–12, 93 S.Ct. at 1015–16.

Defendant argues that the *Enmons* decision applies not only to labor disputes, but also is applicable to all cases involving Hobbs Act extortion. Defendant argues that in order to find a violation of the Hobbs Act, the obtaining of the property involved by the defendant must be "wrongful," that is, without a legitimate claim of right to the property. Defendant places great weight on the Court's statement that the term "wrongful" as used in the Hobbs Act has meaning only if "it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." *Id.*

at 399–400, 93 S.Ct. at 1009–1010. Defendant argues that while the Supreme Court considered the legislative history of the Hobbs Act in making its decision that the provisions of the Hobbs Act did not apply to violence regarding legitimate labor demands, in fact it was engaging in an explicit exercise in statutory construction focusing on the word "wrongful."

In *United States v. Cerilli*, 603 F.2d 415 (3d Cir.1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980), our court of appeals considered the application of the *Enmons* doctrine to areas other than labor disputes. The defendants in *Cerilli* were state employees convicted of Hobbs Act extortion under color of official right for requiring payments in exchange for public contract awards. *Id.* at 418. Defendants argued that the payments in question were actually political contributions and that the solicitation of political contributions is not "wrongful" under the Hobbs Act. Defendants argued that their theory was supported by the Supreme Court's decision in *Enmons*. *Id.* 418–19. Judge Higginbotham rejected this argument, stating that whereas the employees in *Enmons* may have had a lawful claim to wages, the *Cerilli* defendants had no lawful claim to the political contribution solicited. *Id.* at 419. More importantly, however, Judge Higginbotham held that the *Enmons* decision was explicitly tied to labor disputes:

> Any application of *Enmons* to cases outside of [the labor dispute] context must be done with caution. Otherwise there is a danger that *Enmons*, if read as appellants read it, could effectively repeal the Hobbs Act.... The wrong under the Hobbs Act is the manner in which it is obtained. Thus we understand *Enmons* as not relying primarily on the legitimacy of the union's objectives but rather on the clear Congressional intent, as expressed both in the legislative history of the Hobbs Act and the entire federal scheme regulating labor-management relations, that violations during labor strikes not be punishable as extortion under the Hobbs Act. There is no corre-

sponding intent to exempt the type of activity here from the ambit of the Act. *Id.* at 419–10.

Other courts faced with arguments similar to those raised by defendant reached the same conclusion as Judge Higginbotham in *Cerilli* and refused to extend *Enmons* beyond the labor context. *E.g., United States v. Zappola*, 677 F.2d 264, 268–70 (2d Cir.1982), *cert. denied*, 459 U.S. 866, 103 S.Ct. 145, 74 L.Ed.2d 122 (1982) (*Enmons* not applicable where two businessmen beat and threatened a third businessman to coerce the payment of an alleged debt); *United States v. Porcaro*, 648 F.2d 753, 759–60 (1st Cir.1981) (*Enmons* will not prevent Hobbs Act prosecution for use of force and threats to resolve a contractual dispute, even if appellant had a legitimate claim to property); *United States v. Warledo*, 557 F.2d 721, 729–30 (10th Cir.1977) (*Enmons* not applicable to pursuit of an allegedly valid claim against a railroad by the Seminole Nation Treaty People through threats and violence).

For all of the reasons above, defendant's claim of right defense was properly excluded.

■ Defendant's argument that evidence concerning his claim of right should have been admitted as relevant to his state of mind is also without merit.

As stated earlier, the government need not prove that the defendant specifically intended to extort or to instill fear in his victim. *United States v. Furey*, 491 F.Supp. 1048, 1060–64 (E.D.Pa.), *aff'd*, 636 F.2d 1211 (3d Cir.1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 304 (1981). The government must prove that the defendant performed certain acts, the necessary and natural effects of which were to instill fear in the victim. *Id.* Defendant's belief that he had a right to the property involved is not relevant to this determination.

*United States v. Warledo, supra*, addresses the argument defendant now raises. The *Warledo* defendants were members of an Indian group who were convict-

ed of conspiracy to commit Hobbs Act extortion. Evidence at trial demonstrated that the defendants made claims against a railroad, which they asserted held property belonging to the group. When the railroad failed to accede to their claim, defendants threatened physical violence to railroad property and personnel. On appeal defendants argued that the trial court erred in refusing to permit them to explain their intentions in making the claims against the railroad. The defendants argued that their claimed legal right against the railroad precluded the formation of the wrongful intent required under Hobbs Act extortion. *Id.* at 728. The court rejected this argument and stated that "the true gist of defendants' argument is that the use of threats of violence or violence to obtain money ... is not a violation of the Hobbs Act unless the illegal means were used to press an unlawful claim." *Id.* at 729. The court held that the trial court was not obliged to permit the defendants to explain their "good" intentions in seeking the money, stating that their intent was not relevant to a showing that the defendants' activity was not "wrongful" within the terms of the Act. *Id.*

Agnes now raises essentially the same argument as that raised in *Warledo*. For the reasons stated by the Tenth Circuit, these arguments are without merit.

### 3. Victims of the extortion

Agnes contends that the jury was erroneously instructed that any of the five persons present at Crescent Stained Glass on September 13, 1981 could be victims of the extortion. Accordingly, he argues that he is entitled to a new trial. I disagree.

Specifically, the jury was instructed:

With regard to the first element, the term "property" includes not only money and other tangible things of value, but also includes any intangible right considered as a source or element of income or wealth. The victim or person threatened need not be the owner of the business which might be interrupted. It is

sufficient that the victim have some interest in the business.

It is the Government's position that Joseph Lam and Sheryl Hahn were partners in Crescent Stained Glass and that Leigh DiMezza, Michael Rogers and Thomas Bryant were employees and thus, all of these persons were victims. Tr. 17–29.

Defendant states that this instruction is improper in light of his claim of right defense and that he was severely prejudiced with the instruction regarding the three employees. Agnes contends that a Hobbs Act conviction cannot rest on the forcible obtaining of partnership property by a partner in the business from his employees who refused to relinquish the property.

The instruction in question was based upon the decision in *United States v. Biondo*, 483 F.2d 635 (8th Cir.1973), *cert. denied*, 415 U.S. 947, 94 S.Ct. 1468, 39 L.Ed.2d 563 (1974). In *Biondo* the defendant was convicted of conspiracy to extort money in violation of the Hobbs Act. Defendant claimed that the case was improperly submitted to the jury because there was no evidence that the alleged extortion victim had an ownership interest in the business involved. *Id.* at 639. The court rejected this argument, stating that the Hobbs Act does not require that the victim be an owner of a business involved in interstate commerce. Rather, the court stated, "[a] business may be threatened through the people who operate it and a threat toward the financial interest in a business is clearly harmful to that business and, consequently, is violative of the Hobbs Act." *Id.* at 640. The court stated that it was not necessary to precisely characterize the victim's relationship to the business, because the evidence clearly showed that he had a financial interest in the business. *Id.*

■ The challenged instruction, in which I merely set out the government's theory of the case, was proper. I did not tell the jury that they must find that these individuals were victims, but merely stated that this was the government's contention. I also defined the term "victim" for the jury as an individual with some interest in the business. This instruction is not without a basis in fact, because the government introduced evidence to support its contention that all five individuals had an interest in the business. When read in conjunction with the rest of my charge, this instruction properly left for the jury's determination whether any of these individuals were victims of extortion in violation of the Hobbs Act.

■ Defendant also argues that to the extent that his actions toward Tom Bryan formed a basis for his conviction, there was a substantial and prejudicial variance between the allegations in the indictment and the proof at trial. Defendant states that the original indictment, which contained allegations of violation of the Hobbs Act by means of robbery and extortion, was properly redacted to delete the charge of robbery. Defendant argues, however, that the evidence regarding Thomas Bryant quite clearly proved robbery, thereby giving rise to a variance between the allegation of Hobbs Act extortion in the indictment and the proof at trial. This argument is also without merit.

Contrary to the defendant's contentions, the proof at trial regarding Thomas Bryant was clearly not robbery. Mr. Bryant himself testified that the events happened quickly and that he couldn't recall all that occurred. I clearly charged the jury regarding the elements of extortion. It was the jury's function to determine which individuals, if any, were victims of extortion, and from the facts adduced at trial, the jury could have concluded that Thomas Bryant was a victim of extortion in this case.

### 4. *Sequestration of defense witness Helen Sandole*

At the commencement of trial, defense counsel moved pursuant to Rule 615 of the Federal Rules of Evidence for the sequestration of all witnesses. After I granted this motion, defense counsel asked for an

exemption from the sequestration order pursuant to Rule 615(3) so that Helen Sandole, the girlfriend of Agnes, could remain in the courtroom. Counsel stated that just as it was proper to exempt the government's case agent, FBI Agent Bilder, from the order so that he could remain in the courtroom to aid government counsel, so should Ms. Sandole be permitted to remain in the courtroom during trial. In support of this request, counsel stated that Ms. Sandole had "functioned more or less as a secretary, investigator" during the pretrial proceedings and had assisted him by "typing things, serving subpoenas, and interviewing witnesses." The government objected to the exemption of Ms. Sandole, arguing that she was the defendant's girlfriend and was not essential to the defense in the same sense as a case agent is to the government attorney, or an expert needed to advise counsel, and should therefore be excluded. I stated that after considering the arguments of counsel, the rule and the Advisory Committee's Note that I believed that the government's position was correct and denied the defendant's request.

■ Defendant claims that I misunderstood my discretion under Rule 615 and thus erroneously interpreted the Rule when I refused to exempt Ms. Sandole from my sequestration order. Although I initially misstated my discretion to exempt Ms. Sandole from the sequestration order, my refusal to exempt her was not error, and was based upon the exercise of my discretion.

Rule 615 of the Federal Rules of Evidence provides in pertinent part:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of ... (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

The Advisory Committee's Note regarding exception (3) contained in Rule 615 states that "[t]he category contemplates such persons as an agent who handled the transaction being litigated or an expert needed to advise counsel in the management of the litigation."

*Government of Virgin Islands v. Edinborough,* 625 F.2d 472 (3d Cir.1980), is the only case cited by the defendant in support of his motion. In that case the defendant was charged with raping the thirteen year old daughter of his former wife. At the trial the defendant moved for the sequestration of the victim's mother, who was expected to testify. The request was denied pursuant to Rule 615(3). On appeal, the defendant argued that it was error for the district court to refuse to sequester the victim's mother.

The court of appeals stated that the party who believes that the presence of the witness is "essential" must bear the burden of supporting that allegation by demonstrating that the policy of Rule 615 in favor of automatic sequestration is inapplicable. The trial court should explicate the factors considered if sequestration is denied. *Id.* at 476.

The court held that it was not error for the district court to decline to sequester the victim's motion because under the facts of the case she was an "essential" person within category (3) of Rule 615. The court stated:

Persons unfamiliar with judicial proceedings often find that the necessity of testifying produces anxiety. It follows that children, particularly those who must testify about sexual molestations, will find the judicial experience even more frightening if they are required to testify in the unfamiliar surrounds of a sterile courtroom without the sight of a familiar and protective individual. Defendant's interpretation of Rule 615 would require the automatic exclusion of even the parents of a seven year old child. We conclude that subsection (3) authorizes the court to exercise its discretion to permit the presence of a parent of a young witness.

*Id.* at 475.

The defendant's reliance on *Edinborough* is misplaced. As stated in *Edinbor-*

*ough,* the defendant had the burden of demonstrating that Ms. Sandole was an essential person entitled to an exemption from the sequestration rule. The reasons stated by counsel in support of defendant's request were not sufficient to meet that burden. Ms. Sandole, according to defense counsel, performed essentially secretarial and ministerial functions. She was not therefore essential to the defense in the same sense as the mother of the thirteen year old rape victim in *Edinborough.*

In *Oliver B. Cannon & Son v. Fidelity & Casualty Co.,* 519 F.Supp. 668 (D.Del. 1981), the court was presented with a request for exemption under category (3) of Rule 615. The court stated that presumably *every* witness has essential testimony or evidence; in order to be deemed essential under Rule 615, it must be shown that the witness "has such specialized expertise or intimate knowledge of the facts of the case that a party's attorney could not effectively function without the presence and aid of the witness or that the witness would be unable to present essential testimony without hearing the trial testimony of other witnesses." *Id.* at 678. Again, when examined under this standard, Ms. Sandole was not an essential person under Rule 615(3). Defendant did not demonstrate that she possessed such specialized expertise or intimate knowledge of the facts of the case that counsel could not effectively function without her presence. Defense counsel consulted with defendant constantly throughout trial, and it was clear to all present that Agnes was running his defense. Defense counsel vigorously and effectively cross-examined government witnesses and thoroughly examined de-fense witnesses without Ms. Sandole's presence.

Finally, the purpose of the sequestration rule is to prevent the shaping of testimony by one witness to match that of another, and to prevent fabrication and collusion. *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1373 (5th Cir.1981). In light of Ms. Sandole's admittedly close personal relationship with the defendant, the possibility of collusion and fabrication was present.

In sum, Ms. Sandole was not the type of witness properly excludable under Rule 615(3). Thus while I did not make express findings to support my denial of the defendant's motion to exempt Ms. Sandole from the sequestration order, my ruling— in which I expressly relied on my consideration of the Rule, the Advisory Committee's Note, and the arguments of counsel—was not in error.

### 5. *Exclusion of testimony*

Defendant contends that I prejudicially restricted the presentation of his defense through my evidentiary rulings excluding or limiting the testimony of five witnesses.[4]

#### A. *William Levine*

Defendant argues that I improperly excluded the testimony of William Levine. Defense counsel proffered that Levine would refute the testimony of government witness Maryann Zelenevich on cross-examination that Agnes had enlisted her in a scheme to frame government witness Joseph Lam. Levine would have testified that he was present during the conversation with Zelenevich, Agnes and Agnes' girlfriend, Helen Sandole and that it was Zelenevich who had suggested the scheme to frame Lam. The government opposed

---

**4.** Defendant contends here and elsewhere in his motion that I restricted his defense. I did not foreclose any defense raised by defendant which was supported in law. While I properly excluded defendant's claim of right theory, I specifically told counsel that he could argue that Lam and the others did not give Agnes property because of fear, threats or violence, but that he gave it to defendants for *any* other reason. I permitted defendant to prove his defense— which was closely related to his claim of right theory—that Lam was a thief who, after lying to Agnes and all his creditors, actually welcomed the events of September 13, 1981. Throughout the trial I permitted extensive evidence of Lam's dishonesty, which was the center of the defense theory. Counsel argued this theory to the jury. Thus, there was considerable evidence regarding Agnes' theory of defense before the jury and he was not prejudiced by any of my evidentiary rulings.

Levine's proffered testimony, arguing that the testimony constituted extrinsic evidence of a specific instance of misconduct used to impeach Zelenevich's credibility in violation of Rule 608(b), and also that Levine's testimony went to a collateral matter not directly relevant to the central issues of the case. Tr. 1690–91. I excluded Levine's testimony as a collateral matter raised on cross-examination by defendants. I ruled that it was impeachment of the credibility of a government witness by extrinsic evidence and was excluded by Rule 608(b), and that because it was a collateral matter and there was danger of unfair prejudice and jury confusion, it was excludable under Rule 403. Tr. 1693–94.

Defendant argues that the exclusion of this testimony under Rule 608(b) was improper, because the purpose of the testimony was to contradict a witness by a prior inconsistent statement or prior inconsistent behavior and that Rule 613 was applicable. Defendant argues that the proffered testimony was not collateral, but was relevant to bias and motive of Zelenevich.

■ Exclusion of the testimony under Rule 403 was proper. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of due delay, waste of time, or needless presentation of cumulative evidence. Fed.R.Evid. 403. In applying Rule 403 broad discretion must be accorded to the trial judge, because he is in a superior position to evaluate the impact of the evidence, and because he observes the witnesses, defendants, and jurors. *United States v. Robinson,* 560 F.2d 507, 514 (2d Cir.1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978).

This conversation regarding an alleged scheme to frame Joseph Lam which took place after the events of September 13, 1981 was collateral to the events prior to that date, bias and motive. The issue was raised by defendant on cross-examination and was not elicited by the government. It was not relevant to the issues of the case,

Hobbs Act extortion and conspiracy, and if it was relevant there was a danger of undue prejudice and confusion of the jury.

■ Further, Rule 613 would not support the admission of this testimony. A witness may be impeached by extrinsic evidence of a prior inconsistent statement only as to non-collateral matters. *United States v. Nace,* 561 F.2d 763, 771 (9th Cir. 1977).

### B. *Lynn Watkeys*

Defendant argues that the testimony of Lynn Watkeys was unduly restricted. Defendant offered the testimony of Watkeys regarding Lam's testimony in the community for untruthfulness, and regarding certain alleged fraudulent dealings by Lam after September 13, 1981. I permitted Watkeys to testify regarding Lam's community reputation regarding truthfulness, but sustained the government's objection to Watkeys' testimony regarding specific instances of Lam's misconduct.

Defendant argues that while it is true that the proffered testimony bore on the credibility of Lam, it was offered to show his bias as a witness and his motive for lying. Accordingly, defendant argues that the testimony was erroneously excluded.

■ Specific instances of conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. Fed.R.Evid. 608(b). Defendant's argument that the proffered testimony was not evidence of specific bad conduct, but was relevant to Lam's bias and motive, is without merit. Lam's alleged fraudulent activity prior to September 13, 1981 was the subject of considerable testimony during trial, as part of the defense theory that Lam was lying about the events on September 13, 1981 in order to cover up prior fraudulent business dealings with Agnes and others. Lam's business dealings after that date would not tend to show bias or motive to lie about the events on September 13, 1981. Accordingly, the evidence would only tend

to show specific instances of misconduct by Lam and was properly excluded under Rule 608(b). *See United States v. Bocra,* 623 F.2d 281, 288 (3d Cir.1980).

The proffered testimony was also properly excluded under Rule 403. As stated above, the subject of Lam's alleged fraudulent activities had been the topic of considerable testimony. Further testimony on the matter would have been cumulative.[5] Defendant suffered no prejudice by this ruling.

### C. *John Metropulos*

Defendant contends that I improperly excluded the testimony of John Metropulos, the owner of Chicago Art Glass. Defense counsel stated that Metropulos would have testified (1) about a bad check he received from Lam; (2) that he had been trying to get Lam arrested regarding the bad check; and (3) that Lam told him in August that he could not pay him because his partner "cleaned him out." The government objected to the introduction of Metropulos' testimony, arguing that, as proffered, it was barred by Rule 608(b). I sustained the government's objections for the reasons given by government counsel and held that the testimony was also cumulative on the issue of the Chicago Art Glass matter in violation of Rule 403. I found that in light of the mass evidence already presented on the issue, the length of the trial, and the divergence of the jury's attention from the true issues of the case on so many other instances, that the testimony was properly excludable under Rule 403.

Defendant admits that the testimony regarding the bad check and the attempt by Metropulos to get Lam arrested fall within my discretion under Rule 403. The exclusion of testimony was also proper under

Rule 608(b) as specific instances of prior misconduct by Lam. Defendant argues, however, that Metropulos should have been permitted to testify regarding his conversation with Lam in August. Defendant argues that this statement was not extrinsic evidence of prior misconduct by Lam, but was a prior inconsistent statement.[6] Defendant's argument is incorrect on the facts of the case. The proffered statement by Lam was not inconsistent with Lam's testimony at trial. He admitted not paying creditors, and he testified that he could not pay creditors because Agnes took away the business checkbook.

This testimony was properly excluded as cumulative evidence regarding the Chicago Art Glass matter under Rule 403. Because of the considerable amount of evidence admitted regarding it, defendant was not prejudiced by my ruling.

### D. *Helen Sandole*

Defendant argues that I erroneously excluded certain portions of Helen Sandole's direct testimony as hearsay.

Defendant sought to have Ms. Sandole, Agnes' girlfriend, testify regarding several conversations that she had with him. Defendant stated that they were not being offered for their truth, but were being offered to show Agnes' state of mind. No offer of proof was made.

The testimony in question involved statements regarding Lam's alleged misdealings with the business. Two of the conversations occurred about one month prior to September 13, 1981, and thus would have little relevance to Agnes' state of mind on that date. All the testimony would have tended to show, if anything, Agnes' motive in going to Crescent Stained

---

**5.** Defendant also argues that I erroneously prohibited him from asking further questions of Watkeys after the government's recross-examination. I do not agree that the government raised a new matter on recross-examination and properly exercised my discretion in prohibiting defendant from further examining of the witness. Defendant was not prejudiced by this ruling because the testimony on recross-examination left no inference unfavorable to the de-

fendant. In fact, Watkeys' statement that she always required Lam to pay in cash after the first time she extended him credit raised inferences favorable to the defendant.

**6.** At trial defendant offered no specific legal authority in support of the admission of this testimony.

Glass on September 13, 1981. Evidence of motive is not relevant to any element of Hobbs Act extortion. Additionally, defendant's motive as revealed by such testimony would be to claim that partnership property he believed to be properly his. As held earlier, such evidence is not relevant to the offense charged in this case.

### E. *Thomas Nihill*

Defendant contends that the testimony of his expert witness was unduly restricted and that he is thus entitled to a new trial. Specifically, defendant contends that his expert, Thomas Nihill, should have been permitted to testify that Lam's business conduct was improper and that it constituted the earmarks of embezzlement.

At trial the government objected to the testimony, arguing that it would constitute extrinsic evidence of specific instances of misconduct to impeach Lam. The government further argued that the testimony would divert the jury from the central issues of the case.

In my ruling I stated that I would permit defendant to pursue his defense theory that Lam had gotten the business into such a bad financial condition that he was not in fear on September 13, 1981, but that he actually welcomed the event because it was a way to get out of his problem. Tr. 1899–90. I prohibited the expert to testify, however, that Lam's actions constituted embezzling or the earmarks of embezzling. Because of the substantial impact the criminal term "embezzlement" may have had on the jury, and because of the considerable amount of testimony already admitted regarding Lam's alleged wrongdoing, my ruling was proper under Rule 403. Such testimony would have confused the issues and mislead the jury in an already complex trial in which extensive evidence of misconduct had already been introduced. It would have also unfairly prejudiced the government. The defendant was permitted to question Nihill extensively regarding the poor financial condition of the business. Defendant was thus permitted to advance his theory of defense without the term embezzlement. Defendant suffered no prejudice by my ruling.

### 6. *Pretrial motion to suppress*

Defendant argues that the Philadelphia Police did not have probable cause to seize the items from his apartment which belonged to Crescent Stained Glass Company.[7] Specifically, Agnes challenges my finding that as a result of the conversation between the police and a member of the Philadelphia Strike Force prior to the search, the police had probable cause to connect the seized material with criminal activity.

The police must have probable cause to associate the property with criminal activity for the seizure of plain view items. *Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). Probable cause is to be determined using a flexible common sense standard. *Texas v. Brown*, —— U.S. ——, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983). This standard requires that "the facts available to an officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Id.*

Applying this standard to the facts involved in this case, it is clear that the information related to the police by the Philadelphia Strike Force was sufficient to warrant a reasonable man in the belief that the items seized "may be contraband or stolen property or useful as evidence of a crime." Accordingly, I adhere to my prior ruling regarding defendant's pretrial motion to suppress.

---

**7.** Defendant only challenges the seizures made by the Philadelphia Police Department, which consisted of certain documents. Of this seized material, the government introduced only Govt. Exhibits 3, 4, 18A–M and 20. The remaining documents were introduced by defendant.

### 7. *Alleged Grand Jury Abuse*

Defendant claims that the grand jury transcripts that he was provided prior to the commencement of trial and the transcript of Agent Bilder's grand jury transcript he received during trial reveal that the government presented misleading evidence to the grand jury during its investigation. Agnes believes that the government intentionally presented to the grand jury misleading evidence regarding "a loan made by Mike Morrone" and an "alleged scheme by Agnes to convert a Mercedes automobile." He moves for an evidentiary hearing on the issue of the alleged falsity of the information presented, and to determine whether or not the government knew that the evidence was misleading. Defendant provides no further factual allegations regarding this claim, nor does he provide any legal authority in support of it.

■ Defendant's motion, made after he was convicted, is untimely. Rule 12(b)(2) of the Federal Rules of Criminal Procedure requires defenses and objections based on defects in the indictment, other than that it fails to show jurisdiction or to charge an offense, to be raised prior to trial. *United States v. Byrne*, 422 F.Supp. 147, 171 (E.D. Pa.1976), *aff'd in part, rev'd in part, sub nom. United States v. Cahalane*, 560 F.2d 601 (3d Cir.1977), *cert. denied*, 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978).

■ Defendant states that the transcripts were available to him prior to trial and during trial. Yet he raised no objections at that time. Failure by a party to raise defenses or objections which must be made prior to trial constitutes waiver. Fed.R.Crim.P. 12(f). Agnes has stated no reason which would warrant granting relief from the waiver. He has stated no reason for waiting until post-trial motions to raise this issue.

■ Even if I accept defendants argument that his motion is timely, it does not allege with sufficient specificity the evidence which he believes to be misleading, nor the prejudice that he has suffered. For this reason his motion must be denied.

An evidentiary hearing need not be granted as a matter of course. *United States v. Boffa*, 89 F.R.D. 523, 528 (D.Del. 1981). Rather, an evidentiary hearing shall be held "only if the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that relief must be granted if the facts alleged are proved." *Id., citing United States v. Carrion*, 463 F.2d 704, 706 (9th Cir.1972). General and conclusory allegations based upon conjecture or suspicion will not suffice to require a hearing. *Id.* Defendant makes no definite or specific allegations here. He merely states that grand jury transcripts reveal that the government presented evidence to the grand jury regarding a loan and an alleged scheme to convert a Mercedes. This is not sufficient. He has presented no facts which may tend to prove that these representations were misleading. In order for a hearing to be granted, the defendant must show some basis for his claim. In this case defendant has failed to do so.

For all of these reasons, I denied defendant's motions on all grounds.