**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jack WARLEDO, Johnson Warledo, Thomas Lee Ahaisse, Gary Larney and Meredith Malcolm Quinn, Defendants-Appellants.**

Nos. 76–1448, 76–1449, 76–1493—76–1495.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 19, 1977.

Decided June 17, 1977.

Richard A. Pyle, U. S. Atty., Muskogee, Okl. (Robert D. McDonald, Asst. U. S. Atty., Muskogee, Okl., on the brief), for plaintiff-appellee.

Kenneth E. Tilsen, St. Paul, Minn. (Barry Benefield, Norman, Okl., on the brief), for defendants-appellants Thomas Lee Ahaisse, Jack Warledo and Johnson Warledo.

Ernest Anthis, Jr., Muskogee, Okl., for defendants-appellants Gary Larney and Meredith Malcolm Quinn.

Before LEWIS, Chief Judge, and BREITENSTEIN and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

In these appeals from convictions growing out of concerted actions by a group of Indian people against certain railroads, the principal issues are trial errors, including receipt in evidence of a rifle offered for impeachment of one of the defendants as a witness, alleged denial of the right to counsel, and alleged denial of good faith as a defense in connection with Hobbs Act violations.

Each of the above named defendants was found guilty by a jury on three counts of an indictment which charged, first, that as an organization called Seminole Nation Treaty People, they conspired, contrary to 18 U.S.C. Section 1992 and 26 U.S.C. Section 5861(d), to set fire to a Santa Fe Railroad bridge which was used in interstate com-

merce. Various overt acts are set forth in the indictment.

Secondly, it was alleged that the same defendants willfully and knowingly attempted and conspired to obstruct, delay and affect interstate commerce and the movement of articles in commerce by threatening physical violence to personnel and property of Santa Fe and Rock Island Railroad, in furtherance of a plan to extort $217,580.

The third conviction was on a count alleging that on December 18, 1975, the defendants possessed a firearm, an incendiary bomb, which was not registered to them under the National Firearms Registration and Transfer Record as required by law, contrary to 26 U.S.C. Sections 5861(d) and 5871.

Thomas Lee Ahaisse was sentenced to five years on Count I, five years on Count II and five years on Count III.

Gary Larney was sentenced to five years on each count.

Jack Warledo received 10 years on Count II, 10 years on Count III and five years on Count I.

Johnson Warledo was sentenced to five years on Count I, 10 years on Count II and 10 years on Count III.

Meredith Malcom Quinn was sentenced to five years on Count I, 15 years on Count II and 10 years on Count III.

All of the above sentences were ordered to run concurrently.

The Seminole Nation Treaty People was a voluntary organization in which the named defendants and others joined. All of them, with the exception of Quinn, are members of the Seminole Tribe. The organization was structured somewhat as an Indian tribe. However, it was not related to the Seminole Nation which operated under rules established by the Bureau of Indian Affairs.

On November 25, 1975, the Treaty People sent a proclamation to the Chicago-Rock Island-Pacific Railroad, The Atchison, Topeka and Santa Fe Railroad and the Santa Fe Railroad signed by a number of the defendants and others. Defendant Quinn signed as legal adviser. Its grievance against the railroad was with respect to the railroads holding land which allegedly belonged to the Indians.

Later, on December 2, 1975, a call was made to the Santa Fe Railroad by Johnson Warledo. In this call it was requested that a Santa Fe agent, Shupe, contact Warledo. Shupe notified the FBI of the call and went to Seminole, Oklahoma. After meeting with the FBI, Shupe spoke to Johnson Warledo, who made a demand that the railroad pay $217,580. Warledo said that they were going to repossess the railroad if their demands were not met. Shupe inquired whether they were going to sue and Warledo said no, that had not been decided. Subsequently, a meeting was held on December 11 with about 25 persons. In addition, there were two FBI agents along with Mr. Shupe.

At that time, defendant Quinn told FBI agent Elroy that the Treaty People were no longer part of the United States; that Elroy had no further jurisdiction in the territory. He further said that they were going to deliver a demand to the railroad for money and that the railroad would have to pay tribute or suffer the consequences. In response to the question whether they were going to file a lawsuit, Quinn said that courts were irrelevant; that if they didn't pay, trains would be seized, crews held as hostages. He also said that they would stop the trains with barricades and explosives. He further talked about burglaries in Seminole County and indicated that if the railroads did not meet the demands, they would find out what happened to the weapons. Quinn related experiences that he had had in New York with the utility companies which had begged him not to burn the towers, but he did it anyway. Finally, Quinn told the railroad that they had 24 hours to pay the money or drastic action would be taken; that if it was left to him he would blow up the track, seize the trains and stop them from running; that he did not believe in the courts and he would

not rule out blowing up the tracks, seizing the train and killing the crew.

Shupe claimed that he polled the defendants and each of them said they were going to stop the train and use whatever force was necessary. Shupe wrote out a document which put this demand in writing. The document prepared by Shupe was apparently copied by defendants, signed by them and addressed to the Santa Fe Railroad. The people whose names had been written on Mr. Shupe's draft were set forth in the signed document. The persons who signed it are named defendants in this case.

A fire was started on December 16, 1976, on a Santa Fe bridge located four miles east of Tucumseh, Oklahoma. The fire was started by gasoline being placed on tires and ignited. The tires had been placed close to the underside of the railroad ties. It did not result in any substantial damage to the bridge. Quinn and one John Bjorling were seen in the vicinity of the bridge shortly before the fire. Pursuant to a search warrant, a search was made of the Treaty office on December 18 and bottles with orange rags in them were seized. The bottles were the same type as those found at the scene and the fragments of paper and orange rags were at least similar. Apparently the rags came from the same T-shirt. The defendants were arrested at once and they denied everything, including that they had anything to do with bottles or the burning. There was no effort to conceal the mentioned evidence. It was in the vicinity of the office and was not well hidden.

At trial an A.R. 15 rifle was introduced together with a clip and bullets purportedly to impeach the testimony of defendant Ahaisse after he had denied possessing any automatic weapon. It had been found in the trunk of Ahaisse's automobile.

The facts bearing on the contention that three defendants were deprived of the right to counsel are as follows:

Defendants Ahaisse, Gary Larney and Ryder Larney were represented at trial by the attorney, Mr. Van Kolken. The Warledos and Quinn appeared in court on February 19, 1976, seeking permission to leave the jurisdiction. On that occasion the court told them that they had to employ their own attorneys or he would appoint counsel for them. Quinn said: "Are these the only two alternatives I have?" The court said: "You may represent yourself." Quinn said that he would prefer to represent himself. The trial began with Quinn and the Warledos representing themselves.

The points advanced are:

1. Whether it was error to introduce in the courtroom a large rifle which was found in the trunk of the automobile of the defendant Ahaisse.

2. Whether there was a denial of the right to effective assistance of counsel. This is advanced on behalf of Jack Warledo, Johnson Warledo and Meredith Malcolm Quinn.

3. Whether the evidence on behalf of the government was sufficient to satisfy the requirement of possession of an unregistered destructive device.

4. Whether the trial court erred in denial of the good faith defense in connection with the Hobbs Act and also in not requiring the government to prove specific intent under the Hobbs Act.

## I.

THE QUESTION WHETHER THE TRIAL COURT ERRED IN RECEIVING IN EVIDENCE AN A.R. 15 RIFLE TOGETHER WITH CLIP AND BULLETS OFFERED BY THE GOVERNMENT IN THE COURSE OF CROSS-EXAMINATION OF THOMAS AHAISSE, THE JUSTIFICATION FOR THE OFFERING BEING THE EFFORT OF THE U.S. ATTORNEY TO IMPEACH AHAISSE

■ Mainly because the rifle was unrelated to any issue in the case and due also to the fact that it was inherently prejudicial, we are of the opinion that the court erred in receiving it. The defendant Thomas Ahaisse took the witness stand on his own behalf and in the course of the cross-examination the U.S. Attorney first com-

pleted his cross, but then reopened for the purpose of asking Ahaisse about possessing the A.R. 15 rifle. This weapon had been taken from Ahaisse by the Muskogee Police Department after his arrest, indictment and arraignment. The U.S. Attorney asked Ahaisse if he had ever carried any weapons into the Seminole Nation Treaty People Headquarters. When he said no, the U.S. Attorney then asked him if he had ever possessed any automatic weapons himself. When the answer was again no, the A.R. 15 rifle together with the clip and ammunition were offered.

Objection was made that there was a lack of foundation and that it would be highly prejudicial. The U.S. Attorney argued that the weapons and firearms were part of the charge and thus it was a material issue. He further argued that because Ahaisse had denied owning an automatic rifle that it was relevant to offer the rifle for impeachment purposes. The trial court agreed with the latter proposition and received the evidence on that ground. The trial court later cautioned the jury that the evidence was received only for the purpose of impeachment of the witness.

It is not possible to justify the receipt in evidence of this rifle on the basis of its being relevant. There is no positive allegation in the indictment pertaining to such a charge. There is an allegation with respect to use of unregistered firearms, but this pertains to Molotov Cocktails, not to a rifle. There is mention in the indictment of an overt act involving some of the defendants carrying a firearm into the Treaty People Headquarters, and there is evidence that some of the neighbors of the Headquarters saw a person take a small rifle into the office in December, but no one knew what kind of rifle it was, whether real or a toy. The important factor is that a rifle was never a part of this charge and the government has at no time contended that one was used or intended to be used, and so it can be readily concluded that this rifle had no relevancy.

The courts have quite uniformly condemned the introduction in evidence of testimony concerning dangerous weapons, even though found in the possession of a defendant, which have nothing to do with the crime charged. The Seventh Circuit so held in *United States v. Reid*, 410 F.2d 1223, 1226–27 (1969), citing *Thomas v. United States*, 376 F.2d 564 (5th Cir. 1967); *Moody v. United States*, 376 F.2d 525, 532 (9th Cir. 1967); and *Brubaker v. United States*, 183 F.2d 894, 898 (6th Cir. 1960). The court added that it is only where there is an independent evidentiary basis to tie to the use of a weapon, that is the use of the weapon to commit the crime, that the introduction of such evidence is permissible. *Reid, supra*, citing *United States v. Blackburn*, 389 F.2d 93, 95–97 (6th Cir. 1968). There has been no attempt to show that the A.R. 15 related to any of the counts charged.

In *Reid, supra*, a padlock with a rag attached to its hasp was found in the defendant's prison cell. In a trial for assaulting an officer by striking him with his fist, the supervisor of the prison was allowed to testify that the lock and hasp could have been used as a weapon and that this was its probable use. Since the possession of the padlock was unrelated to the incident, it was held that receipt of it constituted prejudicial error—that its only effect could have been to cause the jury to speculate about other bad acts of the defendant. *See* 410 F.2d at 1226.

A parallel situation was present in *Thomas v. United States*, 376 F.2d 564 (5th Cir. 1967), where the defendant was tried and convicted of possession of an illegal shotgun. It was held that it was error for the trial court to receive in evidence a chain and bull whip, the court noting that this was devoid of probative value and that it was clearly prejudicial. Such an object cannot contribute to proof of guilt of the possession of the shotgun and can only serve to arouse passion and prejudice. *See* 376 F.2d at 567.

Similarly, in *Moody v. United States*, 376 F.2d 525 (9th Cir. 1967), it was held in a possession of heroin case that receipt in

evidence of a .38 caliber revolver and cartridges found in the automobile of the accused was prejudicial error. The opinion of the court per Judge Jertberg stated that the presence of the revolver was irrelevant to any issue in the case. The court also held that receipt of the gun in evidence was prejudicial; that it could only tend to establish that the defendant was a bad man generally who engaged in criminal enterprise and who might shoot anybody who attempted to frustrate his importation of heroin. The U.S. Attorney in that case told the jury that the gun showed "what type of people we are dealing with." 376 F.2d at 532.

 In the case at bar no legitimate issue existed as to the possession of a weapon and the defendant did not voluntarily create any such issue. Rather, the cross-examiner injected the issue himself by asking the defendant whether he had ever been in possession of an automatic weapon. When he said no, the weapon was offered for impeachment. It is fundamental that it is not permissible to impeach a witness on a collateral or irrelevant matter elicited on cross-examination. *See United States v. Lambert,* 463 F.2d 552, 557 (7th Cir. 1972). Nor did the limiting instruction of the court cure the prejudice.[1] If any limiting instruction could be given which would alleviate the prejudice, that which the court gave was not it. In the first place, it was not proper impeachment. Secondly, if it was going to be helpful, the jury should have been told that it was wholly collateral to any issue being tried since the defendant was not charged with possession of an A.R. 15 rifle.

The U.S. Attorney does not dispute the fact that the rifle was improper impeachment nor does he dispute the fact that it

was irrelevant. In his oral argument before this court he was asked questions concerning these matters and conceded that while it was irrelevant and improper impeachment, it was nevertheless not prejudicial. Whether it was an automatic or semiautomatic was of no consequence. The objection to its being received is much deeper. It could only tend to show that Ahaisse was a wicked or dangerous individual. Furthermore, in view of the fact that all of these charges were conspiracies, the other defendants in the case were affected in a like manner. The possession of one of the coconspirators of a weapon of this character could not help but prejudice all of the defendants in the eyes of the jury. Also, there was no limiting instruction given whatsoever as to the defendants other than Ahaisse so that the jury was free to think of the other defendants in a like manner as of Ahaisse. It was prejudicial error as to all.

## II.

WHETHER THE COURT ERRED IN ACCEPTING THE STATEMENTS OF QUINN AND THE WARLEDOS AS TO THEIR DESIRE TO REPRESENT THEMSELVES IN VIEW OF THE FACT THAT THEY MIGHT HAVE BEEN UNDER A MISAPPREHENSION AS TO WHETHER THEY COULD BE REPRESENTED BY COUNSEL, AND IN VIEW OF THEIR LACK OF EDUCATION AND THUS UNDERSTANDING OF THE TRIAL PROCESS

In the latter stages of the trial present counsel for Meredith Quinn and Gary Larney who had been present throughout the trial persuaded Quinn and Jack and Johnson Warledo to allow him to take over their

---

1. The instruction was as follows:

Now, yesterday an exhibit was introduced in evidence and the Court instructed you at that time, and it is Exhibit Number 60, it's the automatic weapon, and the clip, and the ammunition attached thereto. That automatic weapon is not a firearm or a destructive device within the meaning of the instructions. That firearm was admitted by the

Court as I told you yesterday for the purpose of—for impeachment purposes in view of the testimony of the defendant Ahaisse, was limited to that purpose, for the purpose of testing that credibility when on the witness stand as viewed in contrast to what his testimony was. You should consider it only for impeachment purposes.

representation. He has entered an appearance here and has submitted a brief in these appeal proceedings. Prior to Mr. Anthis undertaking the defense, the self-representation had been disastrous. It is probable that the trial court was influenced in allowing defendants to represent themselves by the Supreme Court's decision in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), which recognizes the right of self-representation and thus may be opposed to the right of representation by effective counsel. There is no question but that the trial court offered to appoint counsel for all three of the defendants and finally appointed local attorney, Ernest Anthis, to be present at counsel table throughout the trial so as to be available to defendants for such counsel as they wished to receive from him.

The position which the appellants now take is that under the circumstances, there was no valid waiver of the right to counsel. They urge that the record fails to reveal that an explanation was given to them as to the seriousness of the charges, the potential sanctions, defenses which were available and the difficulties and dangers inherent in self-representation. They also point out that the trial court failed to explore in detail their individual backgrounds, education and experience so as to ascertain their capability to represent themselves. They further argue (through present counsel) that it was error for the court to fail to advise them of the possibility of conflicts as between the individuals, and they also contend that the court should have questioned them carefully about their belief that as signatory Indians they could not be represented by a licensed attorney. Undoubtedly the trial court could have questioned the defendants with more particularity in the above mentioned areas. Nevertheless, we are not prepared to rule that there was a denial of the effective assistance of counsel in view of the fact that Mr. Anthis was present in the courtroom and conducted the defense during a large part of the trial.

Whether there has been a valid waiver of the right to counsel is to be determined from the total circumstances of the individual case including background, experience and the conduct of the accused person. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). *Cf. Henderson v. Morgan,* 426 U.S. 637, 96 S.Ct. 2253, 2257, 49 L.Ed.2d 108 (1976). The question is: has the defendant knowingly and intelligently determined to forego the right to counsel? *Zerbst, supra,* 304 U.S. at 464–65, 58 S.Ct. 1019. *See Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

At bar the Warledos and Quinn utilized the assistance of court-appointed counsel for a portion of the trial consisting of part of the second day as well as the third day when the trial was concluded. We are not saying, however, that partial representation serves to overcome any deprivation. Thus, it is not like full representation. *See Maynard v. Meachum,* 545 F.2d 273, 277 (1st Cir. 1976). Given the foregoing, together with the presence of counsel and his active participation and the added factor of election by the defendants to represent themselves in the first instance, the sum total does not, however, constitute a deprivation which would of itself justify a reversal.

Since the judgments are being reversed and the cause being remanded for new trial on other grounds, it is unnecessary in any event to condemn the trial court's action. At the same time, on retrial the question of waiver should be pursued in more depth. There should be a more vigorous pursuit of the capacities of the defendants, their possible misapprehensions of laws pertaining to their being represented and the meaningfulness of their waiver of counsel. *See Moore v. Michigan,* 355 U.S. 155, 164, 78 S.Ct. 191, 2 L.Ed.2d 167 (1957). This is particularly pertinent to Johnson and Jack Warledo, who were apparently acting under the advice of the defendant Quinn.

It is important for the judge to question "as long and as thoroughly as the circumstances of the case before him demand." *Von Moltke v. Gillies,* 332 U.S. 708, 723–24, 68 S.Ct. 316, 323, 92 L.Ed. 612 (1948). Such

an inquiry is particularly important in a conspiracy case which presents a special complexity. *Von Moltke, supra,* at 721–22, 68 S.Ct. 316.

■ There is one other problem here and that is the question of separate counsel for multiple defendants. There should be inquiry as to possible conflicts between their defenses. *See Campbell v. U.S.,* 122 U.S. App.D.C. 143, 352 F.2d 359 (1965).

On retrial the entire question is to be considered in somewhat more depth and breadth with particular attention to the elements which the cases recognize.

### III.

WHETHER THE EVIDENCE WAS LEGALLY SUFFICIENT TO JUSTIFY SUBMISSION TO THE JURY OF THE CHARGE OF POSSESSION OF DESTRUCTIVE DEVICES (SET FORTH IN COUNT III OF THE INDICTMENT)

■ There is no dearth of evidence to support generally the charges in the indictment. No doubt exists as to the defendants, with others, coming together for the purpose of the several conspiracies charged. This is evidenced by the discussions with the members of the FBI and the railroad agent and also by the fact that they had a headquarters and apparently were committed to getting money from the railroads. The discussions with the FBI and the railroad agent were very candid. The implication that violence was to be used to carry out their threats was unquestionably present. They maintain, however, that the evidence to establish their possession of the destructive devices, the Molotov Cocktails, was insufficient. Yet these devices were found in the alley at the rear door of the defendants' headquarters building. Moreover, the orange cloth which was used as wicks in the Molotov Cocktails came from the same piece of cloth, a T-shirt, as did the orange rags found at the scene of the burned railroad bridge. There was testimony that when the rags were assembled together, they appeared to form a T-shirt. There was a torn piece of paper within the headquarters building which was the same character as that which was found at the scene of the bridge burning. Also, the three bottles used in the Molotov Cocktails which were discovered in the alley appeared identical to the glass bottle found at the scene. Mr. Elroy, an FBI agent assigned to the Shawnee Agency, testified that the bottles had the same construction, size, same volume, the same printing across the base, and the mouth of the containers was the same.

Accordingly, then, it cannot be said that the record is devoid of evidence supporting the defendants' possession of the destructive devices. In fact, we consider the evidence amply sufficient to support a finding of possession. In any event, the mere presence of the destructive devices is not the only evidence. The record as a whole supports the submission.

### IV.

WAS A GOOD FAITH DEFENSE APPLICABLE ON THE THEORY THAT THE CLAIM ASSERTED AGAINST THE RAILROAD WAS ITSELF VALID?

Appellants Ahaisse, Jack Warledo and Johnson Warledo maintain that their conduct did not violate the Hobbs Act, 18 U.S.C. Section 1951, because they were in fact asserting a lawful claim against the railroad which was basically valid. They argue that the group which they represented had a legal right against the railroad for recompense which precludes formation of the wrongful intent essential to commission of extortion under the Hobbs Act.[2] Thus, the appellants are saying that the trial

---

2. Section 1951, 18 U.S.C., provides in part:

 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires

so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not

court should have allowed evidence to be given about their intent in making the claim against the railroad and that the court erred in refusing to admit certain evidence on this issue.

■ But the appellants' argument is confused. The requirement of Section 1951 that the use of actual or threatened force, violence or fear be "wrongful" is equated with the intent requirement of that section. Under the conspiracy clause of Section 1951[3] the intent that must be proven by the government is an intent to join and cooperate in the illegal activity proscribed by that section, i. e. a conspiracy to obstruct commerce by extortion. *See U.S. v. Amato,* 495 F.2d 545, 549–50 (5th Cir.), *cert. denied,* 419 U.S. 1013, 95 S.Ct. 333, 42 L.Ed.2d 286 (1974).

■ On intent, the trial court instructed that the conspiracy charge under Section 1951 called for a general intent; that "the particular defendant whose guilt or innocence is being considered [must have] acted knowingly, willfully and unlawfully." We regard this construction to be in accord with the statute. *Cf. Ryan v. U.S.,* 314 F.2d 306, 310–11 & n.2 (10th Cir. 1963).

The true gist of defendants' argument is that use of threats of violence or violence to obtain money from the railroad is not a violation of the Hobbs Act unless the illegal means were used to press an unlawful claim against the railroad. It is true that the Supreme Court in *U.S. v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), held that use of the term "wrongful" in the Hobbs Act limits the statute's coverage to circumstances where the obtaining of property would itself be wrongful "because the

alleged extortionist has no lawful claim to that property." *Id.* at 400, 93 S.Ct. at 1010. From this they conclude that it was error for the district court to restrict their efforts to establish by testimony that they *believed* they had a lawful claim against the railroad.

None of the majority, concurring or dissenting opinions in *Enmons* reaches this extreme conclusion. In *Enmons* the district court had dismissed the one count indictment against members and officials of labor unions which had been brought under the Hobbs Act. The alleged conspiracy consisted of an agreement to use and actual use of violence to obtain for striking employees higher wages and employment benefits from the employer. On direct appeal to the Supreme Court, the government contended that the alleged conduct constituted proscribed conduct within the terms of the Hobbs Act. The Court held in essence that since the employees had a lawful claim to higher wages and benefits, their pursuit of those claims through illegal means did not constitute extortion as defined in the Hobbs Act to include the "wrongful" use of actual or threatened force, violence or fear. "Wrongful" was held to mean something other than conduct in pursuit of a lawful claim to property. It was noted that a state prosecution would certainly lie against the alleged conspirators, but not a prosecution under the Hobbs Act. The dissenting opinion said that the use of violence to obtain higher wages constituted extortion proscribed by the language and legislative history of the Hobbs Act.

■ So, *Enmons* does not extend to the argument here that the Hobbs Act is not

more than $10,000 or imprisoned not more than twenty years, or both.
(b) * * *
(2) The term "extortion" means the obtaining of property from another, with his consent, induced by *wrongful use of actual or threatened force, violence, or fear, or under color of official right.* (Emphasis supplied.)
**3.** Under the clauses of Section 1951, proscribing the obstruction, delay, or attempt to obstruct commerce by robbery or extortion, a general intent to commit those crimes is required. *See U.S. v. Green,* 246 F.2d 155, 159–

60 (7th Cir.), *cert. denied,* 355 U.S. 871, 78 S.Ct. 122, 2 L.Ed.2d 76 (1957), earlier decision, 350 U.S. 415, 76 S.Ct. 522, 100 L.Ed. 494 (1956) (allegations of indictment fall within terms of the Hobbs Act); *U.S. v. Bryson,* 418 F.Supp. 818, 826–27 (W.D.Okl.1975). *Cf. U.S. v. Gupton,* 495 F.2d 550, 551 (5th Cir. 1974) (under Section 1951(a) prohibition of a plan to obstruct commerce by extortion there need be shown only a plan to embark upon a course of extortionate conduct likely to have the natural effect of obstructing commerce).

violated where the defendants merely intended to pursue a lawful claim to property. This is quite different from the pursuit of higher employment wages and benefits which in itself is a lawful claim to property. To say that the pursuit of a payment from the railroad for *alleged* past wrongs is not wrongful taxes the statutory language to a highly unreasonable degree. Also, this splinter group of Seminole Indians is concededly not the official representative of the Seminole Nation across whose lands the railroad obtained its right-of-way. Thus, to permit the appellants to avoid the prohibition of the Hobbs Act because the organization in whose name they act, the Seminole Nation Treaty People, purports to press a lawful claim against the railroad finds no support in *Enmons*. That case was concerned with the paradigm Hobbs Act problem, violent conduct taking the form of robbery or extortion in the field of labor-management relations. We must conclude that pursuit of an allegedly valid claim against a railroad by the Seminole Nation Treaty People and its members is not to be equated with pursuit of union objectives by union officers and members.

Accordingly, the trial court was not obliged to allow the appellants to explain at length their intentions in seeking money from the railroad through threats of violence or actual violence. Under the facts of this case that intent was not relevant to a showing that their activity was not "wrongful" within the terms of the Hobbs Act.

■ Finally, the suggestion that the Hobbs Act applies only to labor racketeering cases and abuses of official positions must be rejected. The Act proscribes all forms of extortion affecting interstate commerce. *See U.S. v. Mitchell*, 463 F.2d 187, 193 (8th Cir. 1972), *cert. denied*, 410 U.S. 969, 93 S.Ct. 1449, 35 L.Ed.2d 705 (1973); *U.S. v. Howe*, 353 F.Supp. 419 (D.Mo.1973). *But see generally U.S. v. Beck*, 511 F.2d 997, 1000 (6th Cir. 1975), *cert. denied*, 423 U.S. 836, 96 S.Ct. 63, 46 L.Ed.2d 55 (1976).

\* \* \* \* \* \*

We have considered as well the contention of the defendants that there was an issue of entrapment in the case growing out of the submission of a writing to them. We have given consideration to this alleged error and we determine that it is lacking in merit.

The judgment of the district court is reversed and the cause remanded for a new trial and for further proceedings consistent with the views expressed herein.