**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 25, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MICHAEL F. LOY,

Defendant - Appellant.

No. 04-3444

(D. Kansas)

(D.C. No. 03-CR-10171-01-WEB)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

Defendant Michael F. Loy pled guilty, pursuant to a plea agreement, to one count of mail fraud, in violation of 18 U.S.C. § 1341, two counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of interstate transportation of stolen property, in violation of 18 U.S.C. § 2314. He was sentenced to sixty-three months' imprisonment, followed by two years of supervised release, and was ordered to pay $239,752.32 in restitution. Loy's subsequent motion to withdraw

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

his guilty plea was denied by the district court.  He appeals that denial.  We affirm.

## BACKGROUND

On October 21, 2003, a twelve-count indictment charged Loy, a certified public accountant, with various counts of mail fraud, wire fraud, money laundering, forging an endorsement on a security, and interstate transportation of stolen property.[1]  In early plea negotiations with the government prior to his indictment, Loy was represented by attorney John Ambrosio.

Loy made his first appearance before Magistrate Judge Karen Humphreys on November 5, 2003.  Attorney Chris Meek appeared with Loy but did not enter an appearance.  Loy informed the court that he was in the process of retaining Meek as his counsel.  Magistrate Judge Humphreys scheduled the case for arraignment on November 12, 2003, in order to accommodate Meek's schedule.

Loy appeared at his arraignment on November 12, accompanied by Assistant Federal Public Defender Timothy Henry.  Henry did not enter his appearance.  When questioned by the court concerning counsel, Loy represented

---

[1]More specifically, Loy was charged with one count of mail fraud, two counts of wire fraud, three counts of money laundering, two counts of forging an endorsement on a security, and four counts of interstate transportation of stolen property.

that he would finalize his arrangements for retention of counsel by the following Friday. Magistrate Judge Humphreys informed Loy that he should "feel free to call Mr. Henry" if he needed help obtaining counsel. R. Vol. II at 154. The magistrate judge continued the arraignment until November 19. On November 19, Loy had still not retained counsel, so the arraignment was again continued, this time until December 3, 2003.

Meanwhile, on November 13, 2003, the district court issued a General Order of Discovery and Scheduling, providing for a trial date of January 13, 2004.

On December 3, 2003, Loy appeared before Magistrate Judge Donald Bostwick for arraignment, and he again was without counsel. The magistrate judge asked Loy if he was "going to be able to retain counsel." Id. at 158. Loy responded, "[y]es, Your Honor. I apologize for the delay." Id. at 158-59. The magistrate judge expressed concern that the delay in retaining counsel would make it difficult for the attorney to adequately represent Loy at trial. When Loy asked whether an attorney could enter an appearance at a later date, the magistrate judge responded that an attorney could enter an appearance at any time. When the magistrate judge asked Loy if he was prepared to proceed to arraignment, Loy responded that he was comfortable proceeding by himself.

The magistrate judge accordingly proceeded with arraignment, informing Loy in detail of the charges against him, to which he pled not guilty. At the conclusion of the arraignment proceedings, the magistrate judge told Loy:

> I cannot say to you more emphatically that you need to get an attorney and get an attorney immediately because things are going to start[] rolling very fast with [district court] Judge Brown and if you don't get an attorney, we're going to get into some real problems in this case.

Id. at 168-69. When asked whether the retention of Meek as Loy's counsel was imminent, Loy responded that Meek would be retained "[w]ithin the next week." Id. at 169. Meek did not, however, enter an appearance as counsel.

On December 18, 2003, the district court granted the government's motion to set a status conference and scheduled the conference for December 29, 2003. Loy failed to appear at the conference on the 29th, but because there was some question whether he had received notice of the conference, the status conference was rescheduled for December 31, 2003. On December 31, Loy appeared at the status conference before the district court with Assistant Federal Public Defender Steve Gradert, whom the court had asked to attend to assist Loy as needed. At this hearing, the district court asked Loy if he had obtained counsel, to which Loy replied that he was meeting with Meek the following Tuesday to finalize arrangements for representation. Loy also informed the court that he could afford counsel. The district court informed Loy that an attorney would be appointed for

-4-

him if he could not afford one, but that if he could afford an attorney, he would either have to hire counsel or represent himself. The court further reminded Loy that he was an educated man with experience in the court system, and that he faced a maximum penalty of twenty years on many counts of the indictment, and ten years on another one.

The court then postponed the status conference until January 2, 2004, instructing Loy to have his attorney present at that conference. The court further told Loy "if you don't have an attorney or can't tell me what you're going to do about this by that time, bring your toothbrush," and it admonished Loy "[a] man of your intellectual[] background and experience gets very little tolerance from me when they don't exercise that and common sense and do what you're supposed to do. Playing around with the Federal courts is not going to work. Do you understand?" Id. at 188. Loy responded that he understood. Gradert stated, "I know Mr. Loy had meant no disrespect to the Court. He's had financial difficulties that have prevented him from being able to get counsel retained, but he's taken care of those financial requirements, and I think it shouldn't be a problem at this time." Id. at 189-90.[2]

---

[2]The government also informed the court at the December 31 status conference that it was having difficulty contacting Loy, inasmuch as his home telephone had been disconnected and Loy repeatedly failed to answer his cell phone.

At the January 2, 2004, status conference, Loy again informed the court that he did not have counsel. An assistant public defender told the court that Loy was attempting to sell some property to obtain the necessary funds and that the sale would be complete by the following Monday. Loy told the court that, as of then, he lacked the money to pay an attorney. The court accordingly appointed Mike Hepperly, a member of the panel of attorneys available to be appointed by the court to represent defendants who cannot afford counsel under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, to represent Loy. Hepperly entered his appearance as appointed counsel. Loy informed the court that he had discussed personally retaining Hepperly after he obtained sufficient funds. The court then scheduled another status conference for January 5, 2004.

Represented by Hepperly, Loy appeared at the January 5 status conference and filed a motion to continue the trial. The district court granted a 120-day continuance. Hepperly informed the court that he had discussed with Loy the financial affidavit Loy would need to file to retain appointed counsel and discovered that Loy did not qualify for appointed counsel because his annual income was between $80,000 and $100,000. Hepperly thus told the court that he had advised Loy not to fill out the financial affidavit because "[h]e clearly makes too much income and has too many assets . . . to be able to have a CJA . . . lawyer." R. Vol. II at 237. Loy again stated that he wanted to retain Hepperly

once he had sufficient funds to pay him. Trial was rescheduled for May 18, 2004. The court scheduled another status conference for January 13.

At the January 13 status conference, Hepperly told the court that he had not yet been personally retained by Loy, and that he was still a CJA-appointed counsel. Hepperly asked that the status conference be continued for a week so he could clarify his status as Loy's counsel. The court again urged Loy to obtain counsel, stating "time's running out for you to get somebody to get in here and give you the representation that you—any defendant deserves." Id. at 246-47. The court continued the status conference until January 20, stating "[a]nd at that time, I'll expect you to have counsel in view of your statements that you're able to pay for counsel." Id. at 247. The following exchange then occurred between the court and Loy:

> THE COURT: Once more. Again, I'm continuing this case in abundance of precaution to see that you have adequate counsel.
>
> DEFENDANT LOY: Yes, sir.
>
> THE COURT: If that isn't arranged, then we're—you have two alternatives; you'll be representing yourself or your very adequate counsel retained.
>
> DEFENDANT LOY: Yes, sir, Your Honor.
>
> THE COURT: And as I told you, I don't recommend you represent yourself.
>
> DEFENDANT LOY: That's correct, Your Honor.

THE COURT: Even as well trained as you are and the background as a CPA and as a person familiar with the workings of our judicial system.

Id. at 247-48.

At the January 20, 2004, status conference the court asked Loy and Hepperly if arrangements for counsel had been made and was told that they had not been. When asked by the court for an explanation, Loy responded, "Your Honor, I'm not yet able to retain Mr. Hepperly, and so I'm ready to proceed today representing myself, Your Honor." Id. at 252. The following exchange then occurred:

THE COURT: Well, we've gone over that before, and I'll remind you of all the things we had told you—Judge Bostwick told you, but you—you're ready to proceed on your own behalf?

THE DEFENDANT: (Nodded head up and down.)

THE COURT: All right. For your services, Mr. Hepperly, I will make whatever arrangements are necessary.

MR. HEPPERLY: Certainly, Your Honor.

THE COURT: I appreciate your services. And I just want to remind you, Mr. Loy, that any pretrial motions are to be filed by April 26th of 2004. The trial is set for May 18th of 2004, and we will go to trial on that day. If you have any discovery or need anything in the way of—for your own defense, why, you should let us know.
    Judge Bostwick went over very carefully with you, didn't he, the problems about your pro se representation and the dangers that are involved with it?

THE DEFENDANT: Yes, sir, Your Honor, he did.

THE COURT: You're well aware of them, I take it.

THE DEFENDANT: Yes, sir, and he said that I was allowed to add counsel any time during proceedings.

THE COURT: You can, but that will not be—will not be for the purposes of delay.

THE DEFENDANT: Correct. That's correct, Your Honor.

THE COURT: You understand that?

THE DEFENDANT: Yes, sir, Your Honor.

THE COURT: Have you ever represented yourself in a criminal case?

THE DEFENDANT: No, sir, Your Honor.

THE COURT: I've explained to you the punishment if you're found guilty in this case and what it is, you understand.

THE DEFENDANT: Yes, sir, Your Honor.

THE COURT: And have you ever had anything to do with the guidelines?

THE DEFENDANT: No, sir, Your Honor.

THE COURT: Well, the library is where you can find them. You know that.

THE DEFENDANT: Yes, sir, Your Honor.

THE COURT: You know you're on your own, that the Court can't help you.

THE DEFENDANT: Yes, sir, Your Honor, that's correct.

THE COURT: Have you had any experience with the federal rules of criminal behavior—evidence?

THE DEFENDANT: No, sir.

THE COURT: They will apply to your case and what your evidence may be.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Well, like we've said before, and I've told you I think it is my opinion that a trained lawyer would defend you far better than you can represent yourself. I think it's unwise for you to try.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Of course you are familiar with certain phases of the law, the tax law.

THE DEFENDANT: Yes, Your Honor.

THE COURT: You're a CPA and accountant.

THE DEFENDANT: Yes, sir.

THE COURT: That's—and while that has some elements of criminal problems with it that you are probably familiar with, I don't think you've had anything to do with the rules of evidence before, have you?

THE DEFENDANT: No, Your Honor.

THE COURT: Well, we've all told you we don't think you should represent yourself, and I don't think repeating it here is going to do any good.

THE DEFENDANT: Understood, Your Honor.

THE COURT: And is your decision entirely voluntary?

THE DEFENDANT:  Yes, sir.

THE COURT:  Due to all the things I've previously told you, Judge Bostwick has told you, your attorney has probably told you, the government's advised you about, you still desire to represent yourself and give up your right to be represented by a lawyer.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And your decision again is entirely voluntary.

THE DEFENDANT:  That is correct.

THE COURT:  Well, I find the defendant has knowingly and voluntarily waived the right to counsel, and I will therefore permit the defendant to represent himself.
        You understand again when all motions in this case must be filed.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And when the trial is going to be.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  I've done this many times before with people.  I do want to indicate to you I've never had one acquitted who represented himself.

THE DEFENDANT:  I understand, sir.

Id. at 252-56.  Hepperly then gave Loy a letter indicating that Hepperly no longer was Loy's counsel.

On April 19, 2004, the government filed a motion to continue the trial.  The district court scheduled a status conference for May 3 to consider the motion to continue.  Loy failed to appear at the May 3 conference, but telephoned the

-11-

clerk's office to inform the court that he was having problems with his car and would be unable to attend. After discussing the government's conflicts with the May 18 trial date previously set, the court granted the motion to continue the trial until June 29, 2004.

On June 24, during a scheduled change of plea hearing,[3] Loy told the court that he had discussed a plea agreement with the government, but was not prepared to enter into it at that time. On June 29, the day scheduled for the commencement of the trial, Loy failed to appear. The government told the court that the FBI agent assigned to the case had received a call at 10:00 p.m. the night before (June 28) from Darla Peterson, Loy's girlfriend, stating that Loy had checked into the hospital with chest pains and would not be appearing in court on the 29th. Government counsel observed that, while it was possible Loy had a heart attack which prevented his appearance at trial, it was also possible that this was another ploy to delay the proceedings. The court then acquiesced in the government's request to issue a forty-eight hour bench warrant for Loy, to allow an investigation into Loy's alleged medical problems. The court also issued a subpoena to obtain Loy's medical records from the hospital and from Loy's

---

[3]Apparently, on June 14, government counsel, Assistant United States Attorney Metzger, contacted the court and informed the court that the parties had reached a plea agreement. Accordingly, the court scheduled a change of plea hearing for June 24.

physician. On July 1, 2004, an arrest warrant was issued for Loy. On July 3, Loy voluntarily surrendered to the Sedgwick County detention facility.

On July 6, Loy appeared with Gradert before Magistrate Judge Bostwick for a hearing on whether Loy's failure to appear at his trial was a violation of the conditions of his pretrial release. The following exchange occurred:

> THE COURT: . . . .Before I go any further, you have said throughout these proceedings that you wish to proceed without a lawyer or you were retaining a private lawyer.
>
> [THE DEFENDANT]: Yes, Your Honor.
>
> THE COURT: All right. As I recall, you appeared first in front of Judge Humphreys and told her you were going to retain Mr. Christopher Meek and it was a matter of selling some real estate and you would get him hired.
>
> [THE DEFENDANT]: Yes, Your Honor. I was told that I didn't qualify earlier because of my income but my income has changed drastically and therefore I think I might qualify now, sir.
>
> THE COURT: Did you sell the real estate?
>
> [THE DEFENDANT]: No sir. I actually didn't have the real estate in my name. It was family that was trying to get the funds.
>
> THE COURT: So are you asking me now to consider the appointment of counsel for you?
>
> [THE DEFENDANT]: Yes, Your Honor.
>
> THE COURT: I have a Financial Affidavit Form which bears your signature and today's date.
>
> [THE DEFENDANT]: Yes, Your Honor.

THE COURT:  Do you recall providing information concerning your assets, your employment and your income to Pretrial Services before the hearing today?

[THE DEFENDANT]:  Yes, Your Honor.

THE COURT:  Was everything that you told them about your income, your assets, your expenses and your employment true and correct?

[THE DEFENDANT]:  Yes, Your Honor.

. . . .

THE COURT:  All right.  It indicates here that through June of this year . . . [y]ou earned a total of $23,000.

[THE DEFENDANT]:  Yes, sir.

. . . .

THE COURT:  Who is ML & Company?

[THE DEFENDANT]:  That's an accounting firm there in Pittsburgh that I and my brother own.

THE COURT:  So you own an ownership interest in that firm?

[THE DEFENDANT]:  Well, I have, yes, an ownership interest in that firm; yes, sir.

. . . .

THE COURT:  [C]an you tell me what you believe your half interest in that company is worth today?

[THE DEFENDANT]:  Probably 10 to $20,000, my share.

. . . .

-14-

THE COURT:  Now, when you were first interviewed by Pretrial Services, you indicated you were going to retain your own counsel and at that time you told the Pretrial Services officer . . . that you were earning $8,000 a month from ML & Company and that your total monthly expenses were three or $4,000.

[THE DEFENDANT]:  That is correct, sir.

THE COURT:  What has changed since that time?

[THE DEFENDANT]:  The publicity surrounding my federal indictment has drastically limited the ML & Company income.

. . . .

THE COURT:  And the real estate that you told Judge Humphreys you were in the process of selling to get cash to retain Mr. Christopher Meek when you appeared in front of her in November of 2003, you now say is owned by somebody else?

[THE DEFENDANT]:  In the family, yes, sir.  It's not owned by me. It never was owned by me.

THE COURT: Who did own it?

[THE DEFENDANT]:  It was my ex-wife and her family. Not officially divorced, Your Honor, but separated.  Have been separated for about six years, Your Honor.

Id. at 326-32.  Magistrate Judge Bostwick observed that, had Loy appeared before him the first time making these representations concerning his financial condition, and if they were correct, Loy would probably have been provided appointed counsel.  However, given the trial schedule, the magistrate judge declined to appoint counsel.

-15-

With respect to his failure to appear for trial on June 29, Loy testified that he did not appear in court because he experienced chest pains the evening of June 28 and was admitted to the intensive care unit of a hospital for testing and was released on June 29 at 4:15 p.m. The government responded that Loy's hospital records indicated he had normal vital signs when he was admitted complaining of chest pains, and that a heart catheterization procedure indicated that the chest pain was not caused by any cardiac condition. The government further informed the court that Loy did not call the district court, the U.S. Attorney's office or the U.S. Probation Office when he was dismissed from the hospital, but instead went to a baseball game. The government asserted that Loy failed to call anyone on June 30 or July 1, and only finally contacted the FBI on the evening of July 2.[4] The magistrate judge found that, based on that evidence, Loy violated the conditions of his release, and the judge revoked Loy's bond and ordered him detained pending trial.

Following the hearing before Magistrate Judge Bostwick, Loy, accompanied by Gradert, appeared in district court for a status hearing. The district court observed that the case was set for trial the following day, July 7, 2004. Loy requested that, in light of the Supreme Court's recent decision in

---

[4]There was testimony that Loy left a message with the U.S. Attorney's office late in the afternoon of July 1, but he failed to contact the FBI until the next day.

Blakely v. Washington, 542 U.S. 296 (2004),[5] the court appoint counsel to represent him. Gradert indicated his willingness to represent Loy, but that he would need time to prepare. The government argued that Loy was simply trying to delay the trial and that he had done the same thing—continually claiming he was going to get a lawyer but then failing to do so—in criminal proceedings filed against him by the Kansas Securities Commission and in at least two civil proceedings.

The district court found that the government's assertion was accurate and supported by the record. It accordingly found that Loy was simply employing a tactic to avoid the responsibility of trial and to delay or prevent resolution of his case. The court then appointed Gradert to serve as standby counsel and released Loy to a halfway house so he could prepare for his trial to commence the next day.

Meanwhile, earlier that day, Loy and Gradert had discussed the possibility of a plea agreement. At approximately 4:00 p.m., after government counsel and Loy and Gradert had discussed a plea agreement for some one and one-half hours, the court informed Loy that he had ten minutes to decide whether to enter a guilty

---

[5]The Supreme Court in Blakely held that in a state prosecution the Sixth Amendment mandates that the maximum permissible sentence for a defendant be determined solely on the basis of "facts reflected in the jury verdict or admitted by the defendant." 542 U.S. at 304.

plea. Shortly thereafter, Loy informed the court that he wished to plead guilty. The district court accordingly reconvened the hearing, and Loy pled guilty to one count of mail fraud, in violation of 18 U.S.C. § 1341, two counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of transportation of stolen property, in violation of 18 U.S.C. § 2314.

At the plea hearing, with Gradert as Loy's standby counsel, the district court reviewed the plea agreement with Loy, including the provisions of the agreement waiving his right to appeal his conviction and sentence and waiving his rights under Blakely to have sentencing enhancements found by a jury beyond a reasonable doubt. The district court reviewed the counts of the indictment and the elements of each offense charged. The court further reviewed the factual statement contained in the plea agreement and Loy, under oath, admitted that the facts contained in the factual statement were accurate and truthful. The court reviewed the sentencing enhancements specified in the factual statement, and Loy admitted that the factual statements relating to the sentencing enhancements were accurate and truthful. Loy further admitted that he knew he had the right to plead not guilty and that by pleading guilty he would be giving up any possible defenses to the charges against him. The court reviewed the other rights Loy would be giving up by pleading guilty. Loy admitted that he understood that the sentence to be imposed on him would be determined "solely by the United States district

judge and that the United States cannot and has not made any promises or representations to [him] as to the sentence" he would receive. R. Vol. II at 306. Loy further admitted that he had been furnished a copy of Blakely, that he had discussed it with his standby counsel, that he agreed his sentence would be determined according to the sentencing guidelines and that he had no questions concerning Blakely. He also acknowledged that he would not be allowed to withdraw his guilty plea, and that he had waived any appeal or collateral attack on his conviction and sentence. He told the court that he had had sufficient time to discuss his case, the evidence, and the plea agreement with standby counsel and that the agreement was the only one he had entered into with the government.

Loy further admitted he had entered into the plea agreement freely and voluntarily, and the court reminded him that the court did not later "want to hear that you now think that you've been pressured into signing this agreement. Have you?" to which Loy responded "No, sir." Id. at 311-12. The court reviewed the potential penalties faced by Loy, and Loy acknowledged that he understood such penalties. The court and Loy then had the following exchange:

> THE COURT: And, Mr. Loy, you know I'm not going to let anybody plead guilty who maintains he's innocent. With that in mind, are you telling the Court that you're guilty?
>
> DEFENDANT LOY: Yes, Your Honor.
>
> THE COURT: You're not claiming to be innocent?

-19-

DEFENDANT LOY:  That is correct.

THE COURT:  And you want to plead guilty and have the Court accept that plea and have the clerk enter a plea of guilty; is that right?

DEFENDANT LOY:  Yes, Your Honor.

Id. at 316.  Loy accordingly pled guilty to counts one, two, three and eleven of the indictment.

After finding that Loy's plea was freely and voluntarily made because Loy was guilty, and was not made "out of ignorance, fear, inadvertence, or coercion" and was made "with a full understanding of its consequences," the court accepted his plea of guilty to the four counts.  Id. at 319.

On July 12, 2004, a status conference was held and the court issued an order modifying Loy's conditions of release to permit him to stay in a halfway house for one month.

On August 4, 2004, attorney Ken Kerns entered an appearance in the case. On August 12, the court granted Loy's motion to further modify the conditions of release so he could remain at liberty and work four days a week.  On September 3, Loy filed a motion for an extension of time to file objections to the presentence report ("PSR"), which the court granted.

On September 23, Loy, through counsel, filed a motion to withdraw his guilty plea.  He argued that he was innocent, that he lacked the intent to defraud

any of his alleged victims, that he pled guilty only to get himself out of jail, that he felt intimidated by the district court when he pled guilty, and that he felt he had little choice with trial scheduled to commence the next day. He further claimed that he had never waived his right to counsel and did not receive effective assistance of counsel, and that his guilty plea was not knowing and voluntary but was made out of fear.

The government responded to Loy's motion to withdraw his plea, arguing that the status of Loy's legal representation was solely the result of his own actions and representations to the court that he could and would retain his own attorney, and that his guilty plea was knowing and voluntary. In his reply to the government's response, Loy argued that he had too much money to qualify for appointed counsel but not enough to hire his own counsel, and that his failure to retain counsel was not a ploy or delaying tactic. He further argued that the government had failed to provide him with discovery as required by a court scheduling order.

On October 25, 2004, a motion and sentencing hearing was held, at which Loy was represented by attorney Kerns. Kerns argued that Loy felt pressured and coerced and that he entered into the plea agreement in order to get out of jail. He further argued that Loy got no benefit from the plea agreement. Loy presented an affidavit from his girlfriend, Darla Peterson, in which she stated that she and Loy

had attempted to sell 7.8 acres of land in Crawford County, Kansas, beginning in February 2004, but that it had not been sold until July 2004, at which time funds from that sale were used to retain attorney Kerns.[6] Loy further argued that the government had failed to provide him with discovery until the Friday before trial, and therefore any delay was at least partially the government's fault.

The government proffered that, with respect to the discovery issue, at the conclusion of the last status conference with Loy in January 2004 the government specifically told Loy that several boxes of documents were available at the U.S. Attorney's office for his review. The government further averred that in January 2004 it had notified Loy that it would provide him with all the marked trial exhibits on the Friday before trial, and they so notified him on that Friday. The government also argued that Loy received a benefit from the plea agreement because the government had agreed not to bring additional charges against Loy, including tax charges resulting from an active tax evasion investigation of Loy. Finally, the government argued that Loy's conduct with respect to obtaining counsel was a "cat and mouse" game with the district court, designed to delay going to trial, that Loy's guilty plea was knowing and voluntary, and that Loy's

---

[6]This property was different from the property owned by Loy's "ex-wife" and her family, which he had previously told the court was available for sale to generate funds for an attorney.

demeanor during the plea hearing indicated that he was not afraid, intimidated or coerced.

The district court denied Loy's motion to withdraw his guilty plea, finding: that Loy "had the financial means throughout this case to retain counsel" but had "consistently refused to make appropriate arrangements with an attorney"; that Loy had "purposefully refrained from hiring an attorney" to postpone resolution of his case; that Loy had refused to file an affidavit supporting appointment of counsel until the last minute; that Loy knowingly and voluntarily waived the right to assistance of counsel and voluntarily and knowingly decided to represent himself; that the financial affidavit Loy finally filed seeking to qualify for appointed counsel was "vague, incomplete and in some respects false" and that Loy had failed to show he was financially unable to obtain counsel; that Loy's "belated claim of financial inability was made in bad faith for the purpose of obstructing" his upcoming trial; that Loy's claim of innocence is "flatly contradicted" by his statements under oath at the plea hearing and in the plea agreement; that granting the motion to withdraw the guilty plea would result in prejudice to the government; that Loy had delayed more than two months before filing the motion to withdraw; that Loy's plea was knowing and voluntary; that, based upon the court's observation of Loy throughout the entire proceeding, Loy was not intimidated but, rather, was "confident and sure of himself at each court proceeding"; that Loy's claimed lack of preparedness for his trial was "due solely

to his dilatory conduct"; that granting the motion to withdraw would result in a tremendous waste of judicial resources; that the government had not improperly deprived Loy of any discovery; and that there was accordingly no fair and just reason to permit withdrawal of the plea. Id. at 382-84. The court's subsequent written order largely reiterated these findings.

The court then conducted a sentencing hearing, at which Loy was sentenced to sixty months in prison on counts one, two and three, and sixty-three months on count eleven, to be served concurrently with the first sentence, for a total of sixty-three months in prison, followed by two years of supervised released, and he was ordered to pay $239,752.32 in restitution. After Loy filed his appeal of that order in our court, the government filed a motion in our court to enforce the plea agreement. This court then issued an order reserving judgment on the government's motion and ordering briefing on the merits to proceed. We accordingly have this appeal and the government's motion before us.

Loy argues on appeal that the district court erred in denying his motion to set aside his guilty plea because he is innocent, he was denied counsel, and his plea was not voluntary and knowing because it was made out of fear.

**DISCUSSION**

"'We review the district court's denial of a motion to withdraw a guilty plea for an abuse of discretion.'" United States v. Yazzie, 407 F.3d 1139, 1142 (10th Cir.) (en banc) (quoting United States v. Jones, 168 F.3d 1217, 1219 (10th Cir. 1999)), cert. denied, 126 S. Ct. 303 (2005). A court considering whether a defendant has presented a "fair and just reason for withdrawal" of a guilty plea must consider the following factors:

> (1) whether the defendant has asserted his innocence; (2) whether withdrawal would prejudice the government; (3) whether the defendant delayed in filing his motion, and if so, the reason for the delay; (4) whether withdrawal would substantially inconvenience the court; (5) whether close assistance of counsel was available to the defendant; (6) whether the plea was knowing and voluntary; and (7) whether the withdrawal would waste judicial resources.

Id. (quoting United States v. Sandoval, 390 F.3d 1294, 1298 (10th Cir. 2004) (quotation marks omitted)). As indicated in our lengthy recitation of the district court's findings and conclusions in the hearing on Loy's motion to withdraw his guilty plea, the court carefully considered all of those factors in denying that motion. We agree fully with the district court's conclusions, as they are amply supported by the record, including the district court's conclusion that Loy's guilty plea was knowing and voluntary, and not the product of fear or intimidation. We address additionally only the issue of whether Loy had adequate assistance of counsel in entering into the plea agreement, including the question of whether he

knowingly and voluntarily waived his right to counsel and decided to proceed pro se.

Loy argues that he did not waive his right to counsel, and that his standby counsel was inadequate to satisfy the Sixth Amendment's requirement of effective assistance of counsel. "To ascertain whether [a defendant] knowingly and intelligently waived his right to counsel, we must consider 'the total circumstances of the individual case including background, experience and the conduct of the accused person.'" United States v. Weninger, 624 F.2d 163, 164 (10th Cir. 1980) (quoting United States v. Warledo, 557 F.2d 721, 727 (10th Cir. 1977)). For such a waiver to be valid, it "'must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.'" Id. (quoting Von Moltke v. Gillies, 332 U.S. 708, 723-24 (1948)).

The record in this case reveals that Loy, an educated professional with some familiarity with the workings of the judicial system, repeatedly assured the court that he was in the process of retaining counsel, only to appear at the next scheduled court appearance without such an attorney. He also repeatedly assured the court that he could afford an attorney. The district court judge repeatedly

-26-

warned Loy of the difficulties he would encounter without an attorney, and, when he represented to the court that his financial condition had changed such that he thought he would qualify for appointed counsel, the court promptly took steps to provide such counsel. When it turned out that Loy did not qualify for appointed counsel, the court permitted him yet more time to make arrangements to retain counsel. Only when Loy appeared yet again without counsel and asked to be permitted to represent himself did the court conclude that Loy had knowingly and voluntarily waived his right to assistance of counsel, after warning Loy repeatedly of the dangers inherent in representing himself, cautioning him not to do so, and inquiring whether the decision he was making was voluntary.

"A defendant's right to obtain counsel of his choice must be balanced against the need for the efficient and effective administration of criminal justice." Id. at 166. And while our court has "recognized a right of a defendant to proceed without counsel," id. (further quotation omitted), a defendant

> may not use this right to play a "cat and mouse" game with the court . . . or by ruse or stratagem fraudulently seek to have the trial judge placed in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of counsel.

Id. (further quotation omitted). We find that Loy engaged in just such a "cat and mouse" game. We hold that his "stubborn failure to hire an attorney constituted a knowing and intelligent waiver of the right to assistance of counsel." Id. at 167.[7]

## CONCLUSION

For the foregoing reasons, we AFFIRM the denial of Loy's motion to withdraw his guilty plea, we GRANT the government's motion to enforce the plea agreement and we DISMISS this appeal.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge

---

[7]Loy argues that the district court failed to give proper consideration to affidavits filed by Meek and Gradert. His standby counsel Gradert filed one, in which he expressed his belief that Loy "entered into the plea of guilty simply to get released on bond. . . . [He] was extremely stressed about the position he was in and pled because he felt he had no other option." Gradert Aff. ¶ 11, R. Vol. I at 65. Meek also filed an affidavit, describing his efforts in attempting to arrange for Loy to hire a very experienced attorney who charged a minimum fee of $75,000, but stating that Loy was never able to "come up with enough money." Meek Aff. ¶ 7, id. at 114. Meek also "was concerned about him representing himself." Meek Aff. ¶ 8, id. Neither of these attorneys was able to witness the entire course of Loy's conduct. The district court was able to witness that entire course of conduct, and it clearly found that Loy's statements and conduct demonstrated an intelligent and knowing waiver of his right to counsel.